UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------
UNITED STATES OF AMERICA          :
                                  :
    v.                            :    No.: 3:15-cr-00080 (SRU)
                                  :
THE ROYAL BANK OF SCOTLAND PLC,   :    December 1, 2016
                                  :
    Defendant.                    :
-----------------------------------------------------------

## UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE

The United States respectfully submits this memorandum in aid of sentencing and in support of the Plea Agreement entered into between the United States and The Royal Bank of Scotland PLC (the "Defendant"), a global financial services company.  On May 20, 2015, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the Defendant waived indictment and pleaded guilty to a one-count information charging it with violating Section 1 of the Sherman Act,15 U.S.C. § 1.  Sentencing in this matter is scheduled for December 15, 2016.

The United States and the Defendant agree that a criminal fine in the amount of $395 million, a period of probation of 3 years, no order of restitution, and a $400 special assessment, is a sentence sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §§ 3553(a), 3572(a).  The Probation Office has also stated in its evaluation that the proposed sentence meets these purposes.  *See* Presentence Report (November 16, 2016) ¶ 82.  The Defendant has cooperated extensively with the investigation giving rise to this matter.  For the reasons set forth below, the United States respectfully moves for a downward departure from

the Defendant's Sentencing Guidelines fine under U.S.S.G. § 8C4.1 and requests that the Court accept the Defendant's guilty plea and sentence the Defendant in accordance with the Plea Agreement between the United States and the Defendant, which was previously filed with the Court.

## I. Summary of the Offense

The Defendant entered into and engaged in a conspiracy, which began at least as early as December 2007 and continued until at least January 2013, to fix, stabilize, maintain, increase and decrease the price of, and rig bids and offers for, the euro/U.S dollar ("EUR/USD") currency pair exchanged in the foreign currency exchange spot market ("FX Spot Market"), by agreeing with its co-conspirators to eliminate competition in the purchase and sale of the EUR/USD currency pair. The Defendant participated in this conspiracy through a EUR/USD trader, who communicated on a near-daily basis with traders employed by the Defendant's co-conspirators in an electronic chat room known by some in the FX Spot Market as "the Cartel" or "the Mafia" (the "Cartel Chat"). The Defendant employed a trader who participated in the Cartel Chat from December 2007 until April 2010.

The conspiracy charged in the Information affected the price of the EUR/USD currency pair, which is the most heavily traded currency pair in the FX Spot Market. This market is a global, over-the-counter market, which operates 24 hours a day during the business week, in which currencies are exchanged for one another. Each currency has a price, which can change continuously throughout the day, often on a second-by-second basis.

The Defendant and its co-conspirators are "dealers" in the FX Spot Market. Dealers are crucial to the market, providing two key functions: they quote prices to potential customers and, if the customer accepts the dealer's quote, the dealer agrees to sell currency to, or buy currency

from, the customer. A dealer's customers can include corporations, asset managers, or other entities requiring foreign exchange. Dealers also trade with one another in a segment of the market known as the "interdealer" market, which is akin to a wholesale market where a dealer can go to find the currency it needs to fill customer orders, among other things. A dealer bears the risk of price changes in the market, but can profit off of the trades it makes.

There is no "closing price" of a currency. Therefore, in order to provide a reference for a currency's price, "fixes" are calculated at certain times of the day. Fixes provide a price snapshot at a specific time. The fix rate is published and disseminated throughout the market and used as a price benchmark, as well as in pricing certain financial products. There are two fixes for the EUR/USD currency pair primarily at issue in this matter: the 1:15 PM (London time) European Central Bank fix ("ECB fix") and the 4:00 PM (London time) World Markets/Reuters fix ("WMR fix"). As a dealer, the Defendant executes currency trades during these fixing times. These trades contribute to the calculation of the fix rate.

Acting through certain traders who participated in the Cartel Chat, the Defendant and its co-conspirators agreed not to compete with one another at certain ECB and WMR fixes. Such conduct was central to the charged conspiracy and, as discussed below, the calculation of the fine agreed to by the parties. The conspirators carried out this agreement by, among other things, coordinating their trading strategies at certain fixes. This coordination, at times, allowed the conspirators to attempt to move the fix price up or down, in order to potentially benefit their trading position. Such conduct, however, could have impacted certain customers of the conspirators, by potentially causing certain customers to pay for currency at a price which could have been lower, or sell currency at a price which could have been higher, absent the conspiracy.

As set forth in the Plea Agreement, the Defendant also engaged in other currency trading and sales practices in conducting FX Spot Market transactions with customers via telephone, email and/or electronic chat. Such relevant conduct related to how the Defendant handled certain limit orders, the disclosure of certain non-public information, the rates provided to certain customers trading over a certain trading platform, and trading in connection with the FX component of a single corporate transaction. *See* Plea Agreement ¶ 13.

## II.  **Legal Standard**

Rule 11(c)(1)(C) authorizes the United States to enter into plea agreements with parties in which the parties agree that a particular sentence is the appropriate disposition of the case. *See* Fed. R. Crim. P. 11(c)(1)(C). The Court, however, "retains absolute discretion whether to accept a plea agreement." Fed. R. Crim. P. 11, Advisory Committee notes to 1999 amendments. As a plurality of the Supreme Court has observed:

> Federal sentencing law requires the district judge in every case to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of federal sentencing, in light of the Guidelines and other [18 U.S.C.] § 3553(a) factors. The Guidelines provide a framework or starting point – a basis, in the commonsense meaning of the term – for the judge's exercise of discretion. Rule 11(c)(1)(C) permits the defendant and the prosecutor to agree that a specific sentence is appropriate, but the agreement does not discharge the district court's independent obligation to exercise its discretion.

*Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion) (internal citations and quotation marks omitted). In exercising that discretion, while the district court may accept or reject the proposed Rule 11(c)(1)(C) plea agreement, it may not modify the agreement's terms. *Id; United States v. Green,* 595 F.3d 432, 438 (2d Cir. 2010) (citing *United States v. Cunavelis*, 969 F.2d 1419, 1422 (2d Cir. 1992)).

### III. Sentencing Guidelines

Due to the size of the FX Spot Market, a key consideration in calculating the fine involves the procedure required when the guidelines fine is greater than the statutory maximum fine for the charged offense. As discussed below, the following provisions are relevant to the fine calculation here: 1) the instructions for calculating a fine under Chapters Eight and Two of the Sentencing Guidelines; 2) the statutory maximum fine for the offense under 15 U.S.C. § 1 and 18 U.S.C. § 3571 (c) and (d); and 3) the instructions in U.S.S.G. § 8C3.1(b) pertaining to instances where the minimum guidelines fine is greater than the statutory maximum fine.

Organizations, such as the Defendant, are sentenced pursuant to Chapter 8 of the Sentencing Guidelines. In the case of antitrust violations, in addition to the provisions of Chapter 8, special instructions with respect to determining fines for organizations are applicable pursuant to U.S.S.G. § 8C2.4(b). The relevant special instruction states that for organizations "in lieu of pecuniary loss under subsection (a)(3) of § 8C2.4 (Base Fine), use 20 percent of the affected volume of commerce." U.S.S.G. § 2R1.1(d)(1). After calculating the base fine, the organization's culpability score is determined pursuant to U.S.S.G. § 8C2.5, which is used to select the minimum and maximum fine multipliers that are then used to determine the applicable fine range. *See* U.S.S.G. § 8C2.6. In the case of antitrust violations, however, the special instructions applicable to fines for organizations state that neither the minimum nor maximum multiplier shall be less than 0.75. U.S.S.G. § 2R1.1(d)(2).

In determining the volume of commerce affected by the conspiracy, the United States focused on conduct by the Defendant involving the ECB and WMR fixes. Such conduct had significant anti-competitive effects in the market. It also provided some of the most complete and accessible trade data, allowing for a fair and expeditious resolution to this matter. A review

of the Defendant's total volume of transactions at ECB and WMR fixes during the conspiratorial period, prorated by 50%, so that the Defendant and its co-conspirators are not held accountable for their collective losses, and prorated further to account for the years in which the Defendant was active in the conspiracy, yields a volume of affected commerce of $880 billion.  Thus, using 20% of the volume of affected commerce under U.S.S.G. § 2R1.1(d)(1) would result in a base fine of $176 billion that exceeds the maximum statutory penalty of $100 million, even when using a minimum multiplier of 0.75.  Pursuant to U.S.S.G. §§ 8C3.1(b), when the minimum guideline fine is greater than the maximum fine authorized by statute, the maximum fine authorized by statute shall be the guideline fine.  While the Sherman Act only authorizes a fine for corporations up to $100 million, 15 U.S.C. § 1, the alternative fine provision nonetheless authorizes a fine equal to twice the gain derived from the offense or twice the loss caused to the victims, if any person derives pecuniary gain from the offense or if the offense results in pecuniary loss to a person other than the defendant, 18 U.S.C. § 3571(c)-(d), which is the case here.

   The United States used the loss associated with the conspiracy to calculate the proposed fine in this matter pursuant to U.S.S.G § 2R1.1 cmt. n. 3 which states: "[t]he loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices." In order to determine pecuniary loss, the United States analyzed the effect the Defendant and its co-conspirators had on the EUR/USD price for a selection of ECB and WMR fixes. Using price data provided by the Defendant and its co-conspirators, the United States analyzed how the EUR/USD price changed for ECB and WMR fixes during the time period between 2009 and 2012, the years for which data was available.  This analysis measured price changes over windows of 30 seconds, 60

seconds and 120 seconds.  The United States observed a range of price changes, with the mean and median effects varying each year.  Given this, the United States concluded that a price movement of approximately .03% of a USD cent was reasonable to use in order to determine the gross pecuniary loss associated with the conspiracy.

Given the .03% estimate, the loss resulting from Defendant's conduct was determined to be $264 million.  The Defendant does not contest this calculation for the purposes of this sentencing.  *See* Plea Agreement ¶ 9(f).  Doubling the $264 million loss yields a statutory maximum fine of $528 million. 18 U.S.C. § 3571(c)-(d).  Since $528 million is the maximum fine authorized by statute, $528 million becomes the Guideline fine pursuant to U.S.S.G. §§ 8C3.1(b).

**IV.     Statutory Factors to Consider at Sentencing**

In addition to considering the Guidelines in effect on the day of sentencing, the Court must also consider the factors set forth in 18 U.S.C. §§ 3553(a) and 3572 in determining and imposing a sentence that is "sufficient but not greater than necessary" to meet specified sentencing goals.  The most relevant factors include: 1) the history and characteristics of the Defendant and the nature and circumstances of the offense (18 U.S.C. § 3553 (a)(1)); 2) the need for the sentence imposed to reflect the seriousness of the misconduct, to promote respect for law, to provide adequate deterrence, and to protect the public from other crimes of the Defendant (18 U.S.C. § 3553 (a)(2)(A – C)); and 3) the Defendant's measures to discipline employees involved in the offense (18 U.S.C. § 3572(a)(8). The United States submits that the proposed sentence contained in the Plea Agreement is sufficient, but not greater than necessary, to achieve these objectives.

### 1. History and Characteristics of the Defendant and the Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The Defendant is a financial services company with banking divisions and subsidiaries throughout the world, and with approximately 87,000 employees. On April 12, 2013, RBS Securities Japan Limited ("RBSSJ"), a wholly-owned subsidiary of the Defendant with its principal place of business in Tokyo, Japan, entered a plea of guilty to a one-count information in which it was charged with violating 18 U.S.C. § 1343 for participating in a scheme to defraud counterparties to interest rate derivatives trades relating to submissions for the London InterBank Offered Rate (LIBOR). To resolve the matter, RBSSJ paid a fine of $50 million and agreed to fully cooperate with the United States and any other law enforcement or government agency designated by the United States, consistent with applicable law and regulations. In addition, on February 6, 2013, the Defendant entered into a deferred prosecution agreement with the United States relating to submissions of Yen LIBOR and other benchmark interest rates (the "LIBOR DPA"). In the LIBOR DPA the Defendant agreed to pay a penalty of $150 million, to cooperate fully with the United States' investigation, and to continue to strengthen its internal controls, among other things. The Defendant successfully completed the terms of the LIBOR DPA.

The charged offense affected an important market in the global economy, continuing for a number of years undetected. By agreeing not to compete with each other, the Defendant and its co-conspirators, at times, increased the likelihood that they would profit, despite the potential effect on other market participants. Ultimately, however, the conspiracy was carried out by a small group of traders in organizations collectively employing hundreds of thousands of people. And when the Defendant became aware of the conduct, it promptly began cooperating with the United States. While the Defendant committed a serious offense, it has accepted responsibility and has taken significant steps to remedy the conduct.

### 2. Seriousness of the Misconduct, Respect for Law, Deterrence and Protection from Other Crimes (18 U.S.C. § 3553(a)(2)(A))

Antitrust conspiracies are by their very nature serious offenses.  According to the background comments in the antitrust guideline, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) and horizontal market-allocation, can cause serious economic harm."  U.S.S.G. § 2R1.1 cmt. backg'd.  The conspiracy charged in the Information affected one of the largest and most important markets in the global economy, continuing for a number of years and impacting market participants in the United States and throughout the world.  Because of the seriousness of the offense the United States has insisted on substantial monetary penalties.  The Defendant has also made changes to its compliance programs, to ensure that the charged conduct does not recur.  But the United States also recognizes that the conduct, while serious, was limited to a small part of the Defendant's operations.  This conduct involved a trader who, while invested with significant responsibility in connection with the Defendant's role as a dealer in the FX Spot Market, was not a member of the Defendant's senior management.

The significant criminal fine of $395 million recommended in resolution of this matter provides deterrence to similar conduct and promotes respect for law.  The criminal fine, if approved by the Court, will be among the largest fines ever imposed for an antitrust violation.  Fines of this magnitude deter similar wrongdoing.  Yet the proposed fine is proportionate and reasonable, given the fact that the Defendant has also resolved with other regulatory authorities, and paid substantial civil penalties including: a $344 million penalty to the U.K. Financial Conduct Authority; a $290 million penalty to the U.S. Commodities Futures Trading Commission; and a $344 million penalty to the Board of Governors of the Federal Reserve.  Moreover, by charging the parent-level organization, the proposed resolution demonstrates that

the United States will hold corporations responsible for the conduct of all of its employees, when appropriate.  This will similarly deter future misconduct by employees in large organizations. Finally, the Defendant's unequivocal acceptance of responsibly for its conduct promotes a respect for law and serves as a positive example for others.

### 3. Measures to Protect the Public from Further Crimes of the Defendant and to Discipline Employees Responsible for the Offense (18 U.S.C. §§ 3553(a)(2)(A), 3572(a)(8)

To protect the public from similar crimes, the Defendant has made significant changes to its compliance program and changed aspects of its governance.  These efforts include programs designed to set the tone from the highest levels of the organization, including the adoption of new Corporate Values and the provision of leadership workshops attended by more than 3000 senior leaders.  The Defendant has also established the Currencies Conduct & Remediation Committee, which has undertaken efforts to enhance the Defendant's policies and procedures. The Defendant has also taken specific actions designed to prevent the conduct giving rise to the charge in this matter.  For instance, the Defendant imposed a chat room ban in 2012, which addresses the main vehicle by which the offense was carried out.  The Defendant also enhanced its monitoring of other forms of communication, and made significant changed to how it handles fix trading.  Taken together, these measures are a significant step by the Defendant designed to protect against similar conduct in the future.

The Defendant has also agreed, as a condition of probation, to report potential criminal violations to both the Antitrust Division and the Criminal Division.  This reporting, covering a period of three years, will ensure continuing communication between the Defendant and the United States.  As a result, the parties will be able to identify and address potentially problematic conduct.

Finally, the Defendant took remedial steps designed to assess the involvement of any employees in the offense, and to discipline any determined to be involved. The individual responsible for the offense is no longer employed by the Defendant.

### V.      **Probation and Restitution**

Pursuant to 18 U.S.C. § 3561(c)(1), the Court may impose a term of probation of at least one year, but not more than five years. In considering whether to impose a term of probation the Court should consider the factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3562. The Court should also consider the factors in U.S.S.G. § 8D1.1 that set forth the circumstances under which a sentence to a term of probation is required.

Pursuant to the Plea Agreement, the parties have agreed to recommend that the Court impose a term of probation of 3 years. During the term of probation, the Defendant has agreed, among other things, to report credible information regarding violations of U.S. antitrust law, as well as U.S. law concerning fraud, including commodities and securities fraud. The Defendant has also agreed to report, in certain contexts, investigations involving the Defendant conducted by other governmental authorities. The full conditions of probation proposed by the parties are set forth in Paragraph 9 (c) of the Defendant's Plea Agreement.

Pursuant to 18 U.S.C. § 3563(b)(2), the Court may order the Defendant to pay restitution. The potential victims in this matter have available a number of civil causes of action, which potentially provide for a recovery of a multiple of the actual damages caused by the charged conduct. In light of the availability of these civil causes of action, the parties have agreed not to recommend that the Court impose an order of restitution. The Defendant has already made significant efforts to pay restitution to potential victims by agreeing to settle certain private

actions relevant to this matter, including an agreed-upon $255 million settlement with certain plaintiffs.

### VI. Motion for Substantial Assistance Departure

The Defendant provided timely, useful and substantial assistance to the United States' investigation into conduct in the FX Spot Market. In consideration of the factors under 18 U.S.C. §§ 3553(a) and 3572 as discussed above, and for the reasons set forth below, pursuant to U.S.S.G. § 8C4.1, the United States moves for a downward departure to reduce the Defendant's guidelines fine to $395 million.

#### 1. The Significance and Usefulness of the Assistance

The United States' wide-ranging investigation into conduct in the FX Spot Market involved the review of enormous volumes of electronic and telephonically recorded conversations collected over a number of years, the interviews of hundreds of witnesses, and the analysis of complex trade data detailing substantial FX transactions, and involving entities throughout the world. For over a year and half leading up to the proposed resolution in this matter, the Defendant provided information to assist the investigations conducted by both the Antitrust Division and the Criminal Division. This cooperation continues to this day.

In its investigations into antitrust conspiracies, the United States relies heavily on the cooperation of insiders, because such conspiracies are inherently secretive. This is especially true in this case, in which much of the evidence of the conduct was contained in an exclusive chat room which could only be viewed by the chat participants themselves. As an added complexity, the communications in this chat room were often filled with dense jargon, describing highly technical trading strategies, and conveyed frequently in shorthand. The Defendant provided valuable assistance by explaining how the FX Spot Market operates, and by defining

and decoding certain jargon traders' use when describing their actions in the market, sometimes via a line-by-line review of chat transcripts. This assistance provided the United States with significant insights into the conduct at issue.

The Defendant produced large amounts of trade data to the United States, and played an important role in helping the United States understand the meaning of the data it received. To facilitate the United States' use of large amounts of complex data, the Defendant gave a number of presentations to the United States during which the Defendant offered its interpretation of the data. The Defendant accordingly provided details about the mechanics of FX trading and how such trading was reflected in the data. Of note, the Defendant made its data consultants available to the United States in order to enhance the United States' understanding of how FX orders flowed through the FX Spot Market, which is critical to properly understanding the scope of the conduct that was the focus of the investigation. The Defendant also provided detailed analyses of trades occurring on certain days of interest to the United States, which helped advance the investigation by giving the United States a granular understanding of the mechanics of the conspiracy.

## 2. The Nature, Extent and Timeliness of the Assistance

The Defendant provided extensive cooperation in a timely fashion. During the investigation, the Defendant responded to numerous requests from both the Antitrust and Criminal Division, which often required the Defendant to quickly and simultaneously provide information about different conduct of interest to the different Divisions, involving different groups of employees, in various business functions. The Defendant also undertook a period of accelerated cooperation at a critical phase of the investigation, which included a massive effort to focus on specific conduct relating to the Defendant's sales practices.

The Defendant produced a large number of documents to the United States. In over 200 separate productions, the Defendant provided over 200,000 documents totaling nearly 1.7 million pages. These productions were finely tuned to the United States' needs, and included a negligible amount of extraneous material. The documents produced by the Defendant were of great use to the United States, especially because many of them dated from an early period during which the conduct occurred, and included transcripts of chats diligently preserved by the Defendant for a number of years. The Defendant also provided audio recordings of over 31,000 telephone calls. The review of such audio required tremendous amount of work and the Defendant notably undertook extensive analytical efforts on approximately 3000 individual telephone calls at the request of the United States. The "deep dive" of these audio recordings provided the United States with important information in a usable form.

The Defendant was of great assistance to the United States' efforts to obtain evidence from individuals in the FX Spot Market. The cooperation in this regard advanced the United States' understanding of the conduct at issue, and helped the United States to identify potential witnesses. The Defendant was diligent in encouraging its employees to provide information the United States and in facilitating interviews by the United States when requested. And the Defendant interviewed approximately 50 employees as part of its own investigation and in order to engage with the United States in a productive manner.

The Defendant helped advance the investigation by providing bi-weekly reports to the United States. This factual reporting occurred in real time, allowing the United States to make prompt use of the information provided by the Defendant. Importantly, the regular contact between the Defendant and the United States allowed for both parties to harmonize their respective investigations. The Defendant openly accepted feedback from the United States,

which resulted in more productive reporting. The United States was able to focus its investigation because of the Defendant's reporting, which advanced the investigation in a meaningful way.

The Defendant provided substantial assistance to the investigation. This assistance was useful, extensive, and timely. Because the Defendant calibrated its efforts to the needs of the investigation, the United States was able to utilize the Defendant's assistance in a manner which advanced the investigation. The Defendant's cooperation made an important contribution to a swift resolution with three separate defendants. A downward departure from the Defendant's Sentencing Guidelines fine is therefore appropriate.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

**VII.    Recommendation**

Pursuant to the 11(c)(1)(C) Plea Agreement between the United States and the Defendant, the United States requests that the Court depart downward from the Defendant's Sentencing Guidelines fine, and recommends that the Court impose: a fine of $395 million, payable in full before the fifteenth day after the date of judgment: a period of probation of 3 years, with the conditions set forth in the Plea Agreement; no order of restitution; and a $400 special assessment.  This sentence is sufficient but not greater than necessary to meet the goals set forth in 18 U.S.C. §§ 3553(a) and 3572.

          Respectfully submitted,

*/s/ Bryan C. Bughman*
BRYAN C. BUGHMAN
ERIC L. SCHLEEF
GEORGE S. BARANKO
ERIC C. HOFFMAN
LEAH GOULD
DAVID CHU

Trial Attorneys
U.S. Department of Justice
Antitrust Division

**CERTIFICATION OF SERVICE**

      This is to certify that on December 1, 2016, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

      BY:    */s/ Bryan C. Bughman*
              BRYAN C. BUGHMAN
              Trial Attorney
              U.S. Department of Justice
              Antitrust Division